## BEN POLK v. THE STATE.

### No. 45.  Decided December 2, 1910.

**Murder—Manslaughter—Charge of Court—Deadly Weapon—Presumption.**

Where, upon trial of murder, the evidence showed that at the time of the homicide the deceased was making an assault upon defendant with the loaded end of a quirt which so used was a deadly weapon, the court should have submitted Article 676, Penal Code, with reference to the presumption of the intent of deceased by the means used by him, and the charge submitted by the court that if the deceased was unlawfully striking the defendant with a quirt to acquit was not sufficient.

Appeal from the District Court of Colorado.  Tried below before the Hon. M. Kennon.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Brown, Carothers & Brown,* for appellant.—On question of court's refusal to submit article 676, Penal Code: Cooper v. State, 48 Texas Crim. Rep., 36; Scott v. State, 46 Texas Crim. Rep., 305; Yardley v. State, 50 Texas Crim. Rep., 644; Kendall v. State, 8 Texas Crim. App., 569; Jones v. State, 17 Texas Crim. App., 602; Cochran v. State, 28 Texas Crim. App., 422, 13 S. W. Rep., 651.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of manslaughter, and given the minimum punishment.

The strongest evidence for the State is that of the witness Nick Johnson to the following effect: that he saw appellant kill deceased Smith; that when he first came to where the parties were appellant was "squabbling" with Walter Williams.  Deceased came up about that time and appellant asked him, "What have you got to do with this, you black son-of-a-bitch?"  Deceased ran and picked up some rocks.  Appellant said, "I will take that back; I wasn't talking to you."  Deceased put down the rocks, thereupon appellant got on his horse and rode away, and when about 100 feet distant turned in his saddle and said, "If you will follow me to the bottom of the hill I'll fight you, you black son-of-a-bitch."  Deceased followed him, and the next thing this witness saw was the parties fighting.  They threw bricks at each other, and deceased had a quirt with which he was striking appellant.  They kept "squabbling" and never got far apart.  Finally appellant made a rush at deceased, and deceased fell.  Appellant fell on top of him.  This witness saw appellant make a motion with his arm, but could not say whether he struck deceased with a knife while they were scuffling before they fell or after they fell, nor did the witness do anything to stop the fighting.  The witness Gunn,

for the State, testified he saw the killing. That when he first saw the parties they were "squabbling" and struck each other. Appellant was on the ground, and deceased had a quirt. They threw brickbats at each other, and moved off a little distance from where they were standing. One brick thrown by appellant struck deceased on the back. Deceased struck appellant in the body with a brick. Appellant then ran at deceased, and deceased began to run, and they ran seventy-five or eighty feet when deceased turned and began to run backwards. He ran in this manner several steps and fell, and appellant jumped on him and stabbed him with a knife. Hurd testified that he saw the parties on the side of the road; that appellant was cursing, and deceased said to appellant not to curse him. Appellant then told deceased that he "was not any more to curse than anyone else." Appellant rode down the hill and deceased followed. The next thing this witness saw was deceased grabbed appellant's quirt from the apron of appellant's overalls and began to strike appellant with the butt end of the quirt. Appellant picked up a brick and threw it at deceased, but missed him. Deceased threw a brick at appellant, and hit him in the stomach. Deceased ran, appellant followed. They ran a short distance when deceased turned with the quirt held back in his hand as if to strike appellant. Deceased stumbled and fell, and appellant jumped on him and cut him with a knife. Another witness, Wade, for the State, testified the parties were fighting. Deceased had a quirt. They were moving backwards and forwards. Part of the time appellant was advancing and deceased retreating, and part of the time deceased was advancing and appellant retreating. They were never far apart. This witness described the movements of the parties pretty much as did the other witnesses. There is a conflict in the testimony as to whether the knife wound was inflicted before or after deceased fell. All the witnesses who testified in regard to the quirt stated that the handle of the quirt was heavily loaded with iron and could be used easily to inflict death, and that it was in fact a deadly weapon. Lena Hurd testified she saw part of the difficulty, and saw deceased striking appellant on the side with a quirt, and while so striking he was using the loaded end of the quirt. She also saw deceased throw a brickbat at appellant and hit him in the stomach which "doubled him up." She saw deceased throw another brick at appellant, which struck him on the leg. She did not see appellant strike deceased. When she was noticing the parties appellant ran behind his horse, was dodging, keeping the horse between himself and deceased, while deceased was striking him. She says she was passing by when this happened, and did not see any more of the difficulty than related. The evidence further shows appellant was talking with Walter Williams, whom appellant describes as a sort of religious fellow; that when anyone cursed around him he would curse too, and it generally made him mad. That appellant was cursing to worry Walter Williams, but had not said anything to

deceased, when deceased walked up and told him to quit cursing him. Appellant said to deceased that he was not cursing him. A few moments later Williams said something, and appellant said to him, "Damn that." Deceased again walked up to appellant, and said, "I thought I told you to quit cursing me." Appellant turned, and deceased looked like he wanted to fight, and appellant said, "You look like you want to fight." Deceased said, "I do." Appellant said, "Well, I won't fight you here, but if you will follow me down to the bayou I will fight you." Appellant got on his horse and started away, deceased following. When about half way down to the bayou deceased rushed up, grabbed the quirt out of the apron of the overalls worn by appellant, and began whipping appellant with the butt end of it. Appellant said to him, "Give me my quirt; if you will give me my quirt I will go home and let you alone." This deceased refused to do, but kept striking appellant with it. Finally deceased reversed the quirt and began striking at the head of appellant with the loaded end. One lick struck appellant on the temple and dazed him. He testified that he had that scar at the time he was testifying, and exhibited it to the jury. This blow stunned appellant, and he slipped off the opposite side of his horse, picked up a brick and threw it but missed deceased. Deceased picked up a brick and threw at him, striking him in the stomach. This doubled appellant up, and while he was in a stooping position, deceased started at him with the loaded quirt, having the tail end of the quirt in his hand. Realizing, as he said, that this was a deadly weapon, and deceased could kill him with it, he jerked out his pocketknife, opened it, and as deceased came upon him with the quirt, struck him one blow. All witnesses agree there was but one lick struck with the knife, which proved to be fatal. The knife is described as being a pocketknife with a curved blade about three inches long. Summed up, the facts briefly show that Williams and appellant were, as the witnesses state, "squabbling." Deceased came upon the scene and entered into the controversy. Appellant rather deprecated what had been said, but finally told deceased if he would follow him down to the bayou he would fight him, as appellant says, with his fist. He rode away and deceased followed. Before reaching the point designated deceased ran up by the side of appellant, grabbed his quirt out of the apron of his overalls, began beating him with it, first with the whip end of the quirt, and then with the loaded end, and this quirt used with the loaded end was a deadly weapon. Appellant made one stab with his knife and killed deceased. The court charged the jury in regard to murder in both degrees, and manslaughter. Appellant having been convicted of manslaughter, the question of murder passes out of the case.

Appellant asked a special instruction in writing, as follows: "When a homicide takes place to prevent murder, maiming or disfiguring if the weapon or means used by the party attempting or committing such murder, maiming or disfiguring, are such as would have been

calculated to produce that result, it is presumed that the person so using them designed to inflict the injury." The court charged the jury that if they should find from the evidence that on the occasion under investigation the defendant did kill the deceased by stabbing him with a knife, but that when he so stabbed the deceased the deceased was unlawfully striking or ̄ attempting to strike the defendant with a quirt, defendant should be acquitted. It is contended by the State that this charge is sufficient on the point indicated by the special charge asked by appellant and refused by the court. The charge asked by appellant should have been given. The weapon as sought to be used was shown to be a deadly weapon. Deceased was making an assault at the time with the loaded end of a quirt, and appellant had the right, from his standpoint, self-defense being in the case, to believe that deceased intended to kill him. The law provides that under such circumstances the accused will have the right to so believe, and, as a matter of law, the statute fixes that intent upon the party making such assault. It is the legal presumption arising by provisions of article 676 of the Penal Code.

For the error pointed out, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

McCord, Judge, being disqualified, Walter C. Lane, Special Judge, sat in the case.